IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-114

 No. 5A21

 Filed 24 September 2021

 IN THE MATTER OF: T.M.B.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on

 17 September 2020 by Judge Monica Bousman in District Court, Wake County. This

 matter was calendared for argument in the Supreme Court on 19 August 2021 but

 determined on the record and briefs without oral argument pursuant to Rule 30(f) of

 the North Carolina Rules of Appellate Procedure.

 Mary Boyce Wells for petitioner-appellee Wake County Human Services.

 Parker Poe Adams & Bernstein LLP, by Carlos E. Manzano, for appellee
 Guardian ad Litem.

 Mercedes O. Chut for respondent-appellant mother.

 BARRINGER, Justice.

¶1 Respondent appeals from the trial court’s 17 September 2020 order

 terminating her parental rights in her minor child T.M.B. (Thomas).1 After careful

 review, we affirm the trial court’s order terminating respondent’s parental rights.

 1 A pseudonym is used in this opinion to protect the juvenile’s identity and for ease of

 reading.
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 I. Factual and Procedural Background

¶2 In December 2006, respondent prematurely gave birth to Thomas who weighed

 only two pounds and four ounces. Respondent’s drug screen came back positive for

 cocaine, and respondent admitted to using cocaine during her pregnancy. In April

 2009, CPS received a report that respondent was homeless, Thomas had a black eye,

 and respondent and her boyfriend, C.H., were abusing drugs. In September 2012,

 Thomas reported that C.H. was violent and aggressive in the home. On

 7 October 2015, Wake County Human Services (WCHS) filed a juvenile petition

 alleging that Thomas was a neglected juvenile. The petition outlined respondent’s

 extensive history with Child Protective Services (CPS) that began on 7 March 2000

 and included sixteen reports of neglect regarding respondent’s other children.

¶3 Following a hearing on 3 November 2015, the trial court entered an order on

 18 November 2015 adjudicating Thomas to be a neglected juvenile. In a separate

 disposition order entered on 8 January 2016, the trial court found that respondent

 signed an Out of Home Family Services Agreement (OHFSA) on 29 September 2015.

 The trial court ordered respondent to comply with the OHFSA and to have supervised

 visitation with Thomas as agreed upon by Thomas’s father, who was given sole legal

 custody of Thomas.

¶4 On 6 September 2018, WCHS filed a petition alleging Thomas to be a neglected

 juvenile and obtained nonsecure custody of Thomas. WCHS alleged that on
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 3 July 2018, a report was received that Thomas was hospitalized for mental health

 treatment at Holly Hill Hospital after running away from home for fear of the

 corporal punishment his father and stepmother inflicted upon him. The petition also

 alleged that a Child and Family Evaluation (CFE) was completed, and the CFE

 provider found that Thomas was exhibiting symptoms in the clinical range for

 anxiety, depression, posttraumatic stress, dissociation, dissociation-overt,

 dissociation-fantasy, sexual concerns, and sexual preoccupation.

¶5 After the adjudication hearing on the petition for neglect on 1 November 2018,

 the trial court entered a consent order adjudicating Thomas to be a neglected juvenile.

 The trial court again ordered respondent to comply with the OHFSA and ordered

 WCHS to retain custody of Thomas.

¶6 Following a permanency-planning hearing on 28 January 2019, the trial court

 entered an order on 21 February 2019 finding that respondent had completed a

 substance abuse assessment in July 2018 for a case regarding one of her other

 children. Respondent’s parental rights to two of her children were terminated in 2018.

 At the time, respondent was the biological mother of five children under the age of

 eighteen, none of whom were in her care. She had been incarcerated and charged with

 felony child abuse in March 2018, convicted of misdemeanor child abuse, and released

 in December 2018. The primary permanent plan for Thomas was set as reunification

 with a parent, with a secondary permanent plan of adoption.
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

¶7 Following another permanency-planning hearing on 22 July 2019, the trial

 court entered an order on 3 September 2019 finding that a WCHS social worker

 visited respondent’s home on 15 May 2019, and the home was unsuitable for a child.

 Respondent shared the home with her mother and respondent’s girlfriend. It was

 cluttered with no room for a child to sleep. The trial court ordered that the primary

 permanent plan remain reunification with a parent, with a secondary permanent

 plan of adoption.

¶8 On 28 January 2020, the trial court entered a permanency-planning order

 finding that respondent had made minimal progress in engaging in her case plan.

 Specifically, the trial court found that WCHS had not been able to contact respondent

 from July to October 2019, respondent had engaged in unpermitted contact with

 Thomas through Facebook in October 2019, respondent had picked Thomas up from

 school and taken him to her home on 29 October 2019, and respondent had arranged

 for Thomas to be picked up from school on 5 November 2019 by C.H., though the

 attempt was thwarted by a WCHS social worker who intervened. In addition, the trial

 court found that respondent was still living with her mother and respondent’s

 girlfriend. Finally, the trial court found that respondent had attended her updated

 substance abuse assessment on 26 November 2019 and complied with two random

 drug screens, both of which were negative. However, the trial court noted that WCHS

 had not received proof of respondent’s attendance at Alcoholics Anonymous/Narcotics
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 Anonymous meetings. After making these findings, the trial court changed the

 primary permanent plan to adoption, with a secondary permanent plan of

 reunification with a parent.

¶9 Around July 2020, Thomas was placed in a therapeutic foster home with

 prospective adoptive parents. Thomas bonded with his foster parents who fully

 incorporated him into their lives. Thomas stated that he would like to be adopted by

 his foster parents.

¶ 10 WCHS filed a motion to terminate respondent’s parental rights to Thomas2

 pursuant to N.C.G.S. § 7B-1111(a)(1), (2), and (9) on 4 February 2020. Following a

 20 August 2020 hearing on WCHS’s motion to terminate respondent’s parental

 rights, the trial court entered an order on 17 September 2020 concluding that

 grounds existed to terminate respondent’s parental rights to Thomas pursuant to

 N.C.G.S. § 7B-1111(a)(1), (2), and (9). The trial court also concluded that it was in

 Thomas’s best interests that respondent’s parental rights be terminated and

 terminated respondent’s parental rights. Respondent appealed.

 II. Analysis

¶ 11 North Carolina law sets out a two-step process for the termination of parental

 rights: an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109 to -1110

 2 WCHS also filed to terminate the parental rights of Thomas’s father, but the petition

 was heard separately, and he is not a party to this appeal.
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 (2019). At the adjudicatory stage, the petitioner bears the burden of proving by clear,

 cogent, and convincing evidence the existence of one or more grounds for termination

 under N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(e)–(f). Then, if the trial court finds

 that one or more grounds for terminating the respondent’s parental rights exist, the

 matter proceeds to the dispositional stage where the trial court examines whether

 termination of the respondent’s parental rights is in the juvenile’s best interests.

 N.C.G.S. § 7B-1110(a).

 A. Standard of Review

¶ 12 Respondent challenges numerous findings of fact from the adjudication stage,

 as well as the trial court’s conclusions of law concerning each of the three grounds

 under N.C.G.S. § 7B-1111(a) which it found warranted termination. On appeal, this

 Court limits its review of the findings of fact to “only those findings necessary to

 support the trial court’s determination that grounds existed to terminate

 respondent’s parental rights.” In re T.N.H., 372 N.C. 403, 407 (2019). We review these

 findings “to determine whether [they] are supported by clear, cogent and convincing

 evidence.” In re Montgomery, 311 N.C. 101, 111 (1984). “A trial court’s finding of fact

 that is supported by clear, cogent, and convincing evidence is deemed conclusive even

 if the record contains evidence that would support a contrary finding.” In re B.O.A.,

 372 N.C. 372, 379 (2019). Further, “[f]indings of fact not challenged by respondent

 are deemed supported by competent evidence and are binding on appeal.” In re
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 T.N.H., 372 N.C. at 407. “The trial court’s conclusions of law are reviewable de novo

 on appeal.” In re C.B.C., 373 N.C. 16, 19 (2019).

 B. Termination Pursuant to N.C.G.S. § 7B-1111(a)(9)

¶ 13 Respondent challenges the trial court’s adjudication that termination was

 warranted pursuant to N.C.G.S. § 7B-1111(a)(9). Under N.C.G.S. § 7B-1111(a)(9),

 grounds exist to terminate a parent’s parental rights when “[t]he parental rights of

 the parent with respect to another child of the parent have been terminated

 involuntarily by a court of competent jurisdiction and the parent lacks the ability or

 willingness to establish a safe home.” N.C.G.S. § 7B-1111(a)(9) (2019). A “safe home”

 is defined by statute as one “in which the juvenile is not at substantial risk of physical

 or emotional abuse or neglect.” N.C.G.S. § 7B-101(19).

 C. Challenges to Specific Findings of Fact

¶ 14 On appeal, respondent challenges numerous factual findings made by the trial

 court. However, we address only those challenges that are necessary to support the

 trial court’s adjudication that grounds existed to terminate respondent’s parental

 rights pursuant to N.C.G.S. § 7B-1111(a)(9). While respondent challenges other

 findings of fact, those findings are clearly unnecessary to support the grounds for

 termination given the findings examined below, so we do not address them.

¶ 15 Respondent challenges findings of fact 17 and 18 stating that she had a history
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 of not complying with orders regarding contact with Thomas’s brother Troy,3

 including “[a]lmost immediate[]” disregard of a 2017 supervised contact order.

 Respondent appears to question these findings’ relevance, noting that they do not

 involve Thomas, and further contending that they were exaggerated. While

 respondent is correct that the findings do not involve Thomas, they are still relevant

 since they involve the previous termination of respondent’s parental rights with

 respect to a child. Moreover, findings 17 and 18 were not exaggerated. As reflected in

 the testimony and exhibits admitted at the termination hearing, the trial court

 rendered an order prohibiting respondent from unsupervised contact with Troy in

 August 2017 and then rendered another order waiving further review in November

 of 2017. Only a month later, in December of 2017, respondent violated that order,

 engaging in unsupervised contact with Troy. This was in addition to numerous other

 violations of visitation orders. Accordingly, we conclude that findings of fact 17 and

 18 were supported by clear, cogent, and convincing evidence.

¶ 16 Next, respondent challenges the trial court’s findings that she lacked insight

 into Thomas’s trauma. Respondent appears to interpret these findings as stating that

 she denied Thomas’s abuse. But that is not what the trial court found. In its findings,

 the trial court noted that respondent had acknowledged to some degree that Thomas

 3 This Court previously used this pseudonym in its opinion reviewing and affirming

 the termination of respondent’s parental rights to Troy. In re T.N.H., 372 N.C. 403, 404, 412–
 13 (2019).
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 had been sexually abused but focused on her lack of insight into this abuse. As

 detailed below, respondent’s own words and actions demonstrated that she did not

 understand the extent of Thomas’s trauma or how to help him heal from it.

¶ 17 Prior to the termination hearing, respondent had asserted multiple times that

 she did not believe Thomas had ever been sexually abused, even when presented with

 evidence to the contrary. At the termination hearing itself, respondent stated she

 believed Thomas was sexually abused, but she did not appear to understand the

 extent of his trauma, downplaying it since he had not been “penetrated.”

¶ 18 Additional evidence supported the trial court’s finding that respondent had not

 gained insight into Thomas’s trauma. Respondent contends that her testimony

 concerning her own abuse was sufficient to show that she understood Thomas’s

 trauma. This testimony consisted of respondent disclosing her own experiences and

 asserting that, “[Y]ou can’t tell me nothing that I already don’t know.” However, other

 testimony showed that this past experience had not provided respondent insight into

 how to prevent her children from being sexually abused or how to care for the trauma

 they incurred. Further, respondent limits her challenge on appeal to Thomas’s sexual

 abuse. However, the trial court found that Thomas’s trauma stemmed from both

 sexual abuse and the severe physical abuse he endured at the hands of his birth

 father and C.H. Respondent does not challenge that she lacked insight into Thomas’s

 trauma resulting from physical abuse. Nor does respondent contend that she has
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 insight into the anxiety, depression, posttraumatic stress disorder, dissociation,

 dissociation-overt, dissociation-fantasy, sexual concerns, and sexual preoccupation

 Thomas endured as a result of both sexual and physical abuse.

¶ 19 Further, respondent’s actions demonstrate a lack of insight into Thomas’s

 abuse. In July of 2019, the trial court suspended respondent’s visitations out of

 concern for Thomas’s mental health. Nevertheless, respondent disregarded those

 concerns, putting her own needs above the safety and welfare of her son. Respondent

 engaged with Thomas on social media, visited with him, and attempted to arrange

 more visits, despite the threat they posed to Thomas’s mental health. These actions

 contradict respondent’s assertion that she understands the trauma Thomas

 experienced. Rather, the evidence of respondent’s actions and her own testimony

 support the trial court’s finding that respondent lacked insight into Thomas’s trauma.

¶ 20 Next, respondent contends that the evidence does not support finding of fact

 33 that she could not control Thomas while he was in her care, prevent him from

 spending time with a past abuser and other unsafe individuals, or stop him from

 engaging in risky behaviors. In support of this challenge, respondent proffers her

 testimony that she could prevent Thomas from visiting C.H. but not from calling him.

 However, other evidence presented at the termination hearing contradicts this

 assertion. In the two-and-a-half years preceding the termination hearing, respondent

 twice obtained custody of one of her children and each time exposed that child to an
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 abuser. First, in January 2018, respondent brought Troy to a motel and then left him

 unsupervised, directly leading to his sexual abuse. Second, in October 2019,

 respondent picked up Thomas and immediately brought him to meet C.H., a past

 abuser. The next month, respondent again would have placed Thomas in a dangerous

 situation, as respondent had arranged for C.H. to pick Thomas up from school until

 the plot was uncovered by a social worker. In addition, respondent conceded that she

 could not control Thomas’s access to technology, and Thomas had demonstrated a

 proficiency for using communication technology. Based on the evidence before the

 trial court, we find that it could discredit respondent’s assertion and find that if

 Thomas was returned to her care, she either could not or would not keep him away

 from dangerous individuals, control him, and prevent him from engaging in risky

 behavior. Accordingly, we are bound by the trial court’s finding of fact 33.

¶ 21 Next, respondent challenges the portions of findings of fact 35–40 relating to

 her obtainment of mental health services. Specifically, respondent challenges the

 findings that her untreated mental health condition made it emotionally unsafe for

 her to interact with Thomas, that respondent did not engage in mental health

 treatment to resolve this issue, that respondent was not taking medication for her

 diagnoses, and that COVID-19 did not cause respondent’s lack of progress.

¶ 22 Each of these findings, however, are supported by sufficient evidence.

 Respondent’s psychological evaluation concluded that she needed to progress in her
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 personal stability before interacting with Thomas again, and her social worker

 testified that she never reached a place where she could safely participate in

 Thomas’s mental health treatment. Additionally, the documentary and testamentary

 evidence reflected that respondent was neither taking medication for her mental

 health diagnoses, despite finding that it had helped her in the past, nor participating

 in any mental health counseling. Additionally, though respondent admitted that she

 needed mental health treatment to stabilize her mood, she had not participated in

 any appointments with Turning Point despite being directed to them for treatment.

 Respondent blames Turning Point and COVID-19 for her nonparticipation in mental

 health treatment, but the evidence demonstrates that respondent had a history of

 missing mental health appointments, even when they were scheduled for her in

 advance and she received numerous reminders.

¶ 23 Finally, respondent challenges the trial court’s finding that she was unable to

 provide safe and stable housing for Thomas. Respondent’s challenge mostly centers

 on the fact that she was looking for housing at the time of termination. However,

 respondent had only recently started looking for housing at the time of the

 termination hearing. Prior to that, respondent had been living with her mother in a

 home a social worker had reviewed and found not suitable for a child. The last time

 respondent brought Thomas to visit this home, in October of 2019, he was exposed to

 a past abuser. Further, at the time of the termination hearing, respondent was
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 residing in a motel. Given the foregoing, the trial court’s finding that respondent had

 not obtained safe and stable housing for Thomas was supported by clear, cogent, and

 convincing evidence.

 D. Challenge to the trial court’s legal conclusion

¶ 24 Respondent further argues that the facts addressed above do not support the

 trial court’s legal conclusion that grounds existed to terminate her parental rights

 pursuant to N.C.G.S. § 7B-1111(a)(9). We disagree. As an initial matter, we note that

 the first requirement of N.C.G.S. § 7B-1111(a)(9)—that the parental rights of the

 parent with respect to another child have been previously terminated—is met in this

 case and unchallenged. Respondent previously had her custody to Thomas’s brother

 Troy terminated, which this Court affirmed. See In re T.N.H., 372 N.C. at 412–13.

 Accordingly, respondent focuses her arguments on the second requirement of

 N.C.G.S. § 7B-1111(a)(9)—that respondent lacks the ability or willingness to

 establish a safe home. Respondent contends that she is able and willing to provide a

 safe home since she is no longer incarcerated, understands the sexual trauma

 Thomas endured, would not put Thomas at risk of abuse, no longer is in a relationship

 with one of Thomas’s abusers, and sufficiently changed her circumstances.

¶ 25 However, respondent’s contentions are contradicted by the trial court’s

 previously described findings of fact to which this Court is bound. These findings

 show that at the time of the termination hearing respondent was unable to protect
 IN RE T.M.B.

 2021-NCSC-114

 Opinion of the Court

 Thomas from abuse or prevent him from engaging in risky behaviors. Indeed,

 respondent was still actively exposing Thomas to abusers. Additionally, respondent

 had not gained insight into Thomas’s sexual- or physical-abuse-related trauma or

 how to properly care for it. Further, respondent had not procured a safe or stable

 home for Thomas to live in. Finally, respondent had failed to progress in her mental

 health treatment to a point where she could safely interact with Thomas without

 endangering his emotional safety. These findings, which were supported by clear,

 cogent, and convincing evidence, are sufficient to support the trial court’s conclusion

 that respondent lacked the ability and willingness to provide Thomas a safe home.

 III. Conclusion

¶ 26 Since only one of the grounds outlined in N.C.G.S. § 7B-1111(a) is necessary to

 support a termination of parental rights, we decline to address respondent’s

 arguments challenging the trial court’s finding that grounds existed to terminate her

 parental rights under N.C.G.S. § 7B-1111(a)(1) and (2). Respondent does not

 challenge the trial court’s determination, in the dispositional stage, that it was in

 Thomas’s best interests to terminate her parental rights. Accordingly, we affirm the

 trial court’s order.

 AFFIRMED.